702 F.2d 674
 D. Bruce JACKSON, Robert G. Hersan, J.R. Gottlieb, Steven W.
Ellenbogen, Mel G. Helms, Jay S. Eigel, d/b/a
Aries Gottlieb Allentown Joint Venture, Appellants,
v.
ROOSEVELT FEDERAL SAVINGS & LOAN ASSOCIATION, Appellee.
 No. 82-1193.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 12, 1982.
Decided March 11, 1983.
 
 Popkin, Stern, Heifetz, Lurie, Sheehan, Reby & Chervitz, Richard J. Sheehan, Michael H. Wetmore, St. Louis, Mo., for appellants.
 Bryan, Cave, McPheeters & McRoberts, Thomas C. Walsh, John Michael Clear, John I. Alber, St. Louis, Mo., for appellee Roosevelt Federal Sav. & Loan Ass'n; Thomas A. Stegeman, St. Louis, Mo., of counsel.
 Before HEANEY and ROSS, Circuit Judges, and HENLEY, Senior Circuit Judge.
 HENLEY, Senior Circuit Judge.
 
 
 1
 D. Bruce Jackson, a partner in Aries Gottlieb Allentown Joint Venture (Aries), a Pennsylvania partnership, and the five other members of the Aries partnership brought a diversity action against Roosevelt Federal Savings & Loan Association (Roosevelt Federal) alleging breach of a loan commitment agreement. Aries now appeals from the order of the district court[1] granting summary judgment in favor of Roosevelt Federal. We affirm.
 
 
 2
 In early summer, 1979 the Aries partnership applied to Roosevelt Federal through a mortgage brokerage firm for a long-term loan of $1,987,500.00 to finance a shopping center development on a tract of land located in Lehigh County, Pennsylvania. Appellants sought to obtain financing for the shopping center, whose principal tenants would be Weis Markets, Inc., Friendly Ice Cream Corporation (a wholly-owned subsidiary of Hershey Foods Corporation), and White Cross Stores, Inc., through the use of I.R.C. Sec. 103 tax-exempt industrial development bonds[2] that would be issued by the Lehigh County Industrial Development Authority (LCIDA).
 
 
 3
 On June 22, 1979 Roosevelt Federal extended its offer to provide permanent tax-exempt financing.[3] After Roosevelt Federal acceded to certain modifications proposed by Aries, appellant Jackson, acting on behalf of the partnership, accepted the loan commitment offer by signing the agreement tendered in early July. A copy of the commitment agreement incorporating the modified terms was signed by Jackson on September 17, 1979. The final version was signed one month later.
 
 
 4
 Both the commitment agreement initially accepted by the Aries partnership and the final version executed by the parties incorporated by reference seven special conditions,[4] only one of which is at issue in this case. That provision, known as Special Condition No. 4, required Aries to provide to Roosevelt Federal before the September 30, 1980 loan closing deadline, "[s]atisfactory evidence that the loan [would] be tax exempt for its life." The dispute now before us arises from the parties' divergent views of what constitutes "satisfactory evidence."
 
 
 5
 In presenting its views on the question of satisfactory evidence to the district court Roosevelt Federal submitted the affidavits and depositions of a number of witnesses. Among these witnesses was Ronal R. Newbanks, bond counsel for Roosevelt Federal in the Lehigh County transaction who at all pertinent times was listed in The Bond Buyers Directory of Municipal Bond Dealers of the United States (Red Book), an annual publication that indicates, inter alia, counsel who specialize in the practice of tax-exempt municipal bond law.[5] Newbanks initially set forth the criteria that must be satisfied to qualify for tax exemption under I.R.C. Sec. 103(b)(6)(D), the applicable provision in this case. He noted that interest on the Roosevelt Federal loan would be exempt from federal income taxation only if the aggregate of the face amount of the bond ($2,550,000.00 here), any includable prior issues, see n. 2 supra, and certain capital expenditures paid or incurred by the developer and principal users (tenants) of the shopping center and any related persons within three years before and three years after the date the bond was issued did not exceed ten million dollars. Newbanks further stated that his role as bond counsel was to render an unqualified approving opinion to Roosevelt Federal concerning the tax-exempt character of the bond, and that in his experience established lenders invariably required an unqualified approving opinion of nationally recognized bond counsel, that is, one listed in the Red Book, as a condition to the extension of credit. He indicated that an unqualified opinion of nationally recognized bond counsel provides assurance of the tax-exempt status of the bond for the long-term lender and for any subsequent purchaser of the bond in the secondary market. In his deposition he noted, "Normally a[n] [initial] purchaser [that is, a long-term lender] will not buy a bond if there is a qualified opinion.... I would doubt that a sale of a bond with a qualified opinion could be made in the secondary market."
 
 
 6
 John M. Pollaci, a Roosevelt Federal vice-president and commercial lending officer until August, 1980, corroborated Newbanks' testimony on these points. He expressly stated that the term "satisfactory evidence" in Special Condition No. 4 of the loan commitment agreement comprehended an opinion of nationally recognized bond counsel that the interest on the bond would be tax-exempt.[6] Moreover, Pollaci noted that Roosevelt Federal had a responsibility to its clients in the secondary bond market to ensure that the bonds would remain tax-exempt.
 
 
 7
 Elaborating on his function as bond counsel,[7] Newbanks then stated that he requested and reviewed documentation from the borrower and the issuing public body to satisfy himself that the bond issue was tax-exempt. He added,
 
 
 8
 Such documentation ... must include certificates by the 'principal users' of the facility to be financed through the tax-exempt industrial development bond and their 'related persons,' setting forth their prior capital expenditures within the incorporated muncipality [sic ] or unincorporated area of the county in which the facility is located for the preceding three years, and a statement concerning and limiting estimated future capital expenditures within the same locale for the following three years. These certificates are necessary because the capital expenditures must be counted in determining whether the $10,000,000 ceiling has been, and to ensure that it will not be, exceeded. Without such certificates (commonly called 'capital expenditure certificates' or 'project certificates'), it is impossible to render an unqualified approving opinion because bond counsel would not have sufficient information to determine whether the bonds would be tax-exempt.
 
 
 9
 Newbanks further stated, "No recognized bond lawyer (or anyone familiar with tax-exempt industrial development bond financing) could validly disagree with my statement [in a March 6, 1980 letter to John Pollaci] that capital expenditure certificates are 'the standard requirements of a tax-exempt loan' and represent no more than 'the customary documentation' in such transactions." The testimony of M. Maynard Holcombe, Jr., an attorney listed in the Red Book who assisted Newbanks in the Lehigh County financing, supports bond counsel's assertions in this regard. Holcombe stated that there was nothing unusual in the types of representations required in the certificates and that in connection with tax-exempt loans of more than one million dollars, it was a "universal [practice] ... to have such certificates executed and delivered [before] ... closing."
 
 
 10
 Appellants also presented evidence delineating their view of Special Condition No. 4 and of the requirements for exemption from federal taxation under I.R.C. Sec. 103.
 
 
 11
 We observe that when the loan request was submitted to Roosevelt Federal appellants had, for all practical purposes, no experience in tax-exempt financing. Appellant Jackson described his only previous encounter with tax-exempt bond issues.[8] He stated that in December, 1978 he and four others not associated with Aries met with Cincinnati attorney Richard D. Spoor to discuss a proposal for financing a restaurant in Dayton, Ohio through the use of a tax-exempt industrial development bond. Jackson noted that Spoor did not at any time explain the qualifications for tax-exempt financing, but instead referred him to I.R.C. Sec. 103(b)(6)(D).[9] Jackson indicated that although he read the pertinent provisions, he did not seek any information concerning their interpretation and the restaurant financing project was soon abandoned.
 
 
 12
 Appellants' store of knowledge and experience relating to tax-exempt financing transactions remained miniscule throughout the loan application process and beyond. The brokerage firm that prepared the loan application on appellants' behalf did not provide the Aries partnership with any materials specifying the criteria that a borrower must satisfy before obtaining tax-exempt financing. Neither appellant Jackson nor any other member of the Aries partnership discussed the terms or the meaning of section 103 or Special Condition No. 4 with representatives of Roosevelt Federal before Aries accepted the commitment agreement. In addition, Roosevelt Federal did not volunteer any information concerning the intricacies of section 103. Indeed, appellants' silence regarding their inexperience may have led Roosevelt Federal to assume throughout the course of the Lehigh County transaction that the Aries partners were well versed in the requirements of tax-exempt financings. In this regard, John Pollaci, who processed the loan application, stated, "As a matter of course, when a broker sends a request for a tax exempt loan, I automatically assume the individual [i.e., the borrower] has knowledge of the rules, regulations, laws ... and I'm dealing with a knowledgeable individual...."
 
 
 13
 In addressing deposition questions concerning his understanding of the provisions of section 103(b)(6)(D) appellant Jackson did indicate a general awareness from the outset of the transaction that the tax-exempt status of the loan would be lost if the aggregate capital expenditures of Aries, the three principal tenants, and any related persons surpassed the ten million dollar limit during the applicable six year period. As to the three year period following closing of the long-term loan, Jackson stated his belief that Aries was required to obtain a certificate containing only a nonbinding statement of intended capital expenditures from each major tenant and any related persons.[10]
 
 
 14
 The record suggests two reasons for appellant's misapprehension of the substance of the required project certificates, both of which stem from a dearth of practical experience in tax-exempt financing. First, in a conversation with Mark H. Scoblionko, counsel for the LCIDA, Jackson learned that the issuing authority purportedly required certificates setting forth only the capital expenditures of the enumerated parties for the three years before the date of the contemplated bond issue as a condition to authorization of the bond.[11] Second, at his deposition Jackson confessed that at the time of the financing transaction in question he was completely unaware of the existence of the secondary bond market and the need perceived by lenders to obtain an unqualified approving opinion of nationally recognized bond counsel.[12] Based on his conversation with Scoblionko, ignorance of the secondary market in tax-exempt bonds, and only a general awareness of the necessity of limiting capital expenditures for the three year period after the issuance of the bond, appellant, who investigated the qualifications for tax exemption no further and never asked to examine capital expenditure certificates accepted by Roosevelt Federal in other tax-exempt financings, apparently assumed that both the construction and long-term lenders would be satisfied with certificates containing a report of actual capital expenditures for the three years before closing and a mere statement of anticipated expenditures for the three years following that date.
 
 
 15
 Alan A. Biegel, counsel retained by Aries in late summer, 1979 in connection with the shopping center financing, also lacked any practical experience in tax-exempt industrial development bond transactions. At the time he was retained he had never served as counsel for a borrower in such a financing venture or dealt with the taxability of interest on an industrial development bond. Moreover, he had no special expertise in tax law.
 
 
 16
 Biegel questioned Donna Goodenough, Commercial Closing Manager at Roosevelt Federal until September, 1980, concerning the meaning of Special Condition No. 4 some time before the final draft of the agreement was signed by Aries on October 17, 1979. In response to Biegel's inquiry, Goodenough evidently stated and Biegel understood that the provision merely required the borrower to provide standard documentation demonstrating the tax-exempt character of the loan. The record reveals that counsel for Aries did not ask Goodenough or anyone else what standard documentation in a tax-exempt financing entailed.
 
 
 17
 During his deposition, Biegel stated that he knew from the outset of the transaction that Aries was required to submit project certificates to Roosevelt Federal. In responding to a question concerning his understanding of the content of the certificates he indicated his belief that only an account of capital expenditures paid or incurred within the three year period before the bond issuance date was necessary. When questioned concerning the source of his belief he initially stated that he obtained the information from Donna Goodenough, but later acknowledged that he "may have even got[ten] [it] from Mark Scoblionko." Although a reading of section 103 had alerted him to the necessity of not exceeding the prescribed ten million dollar limit during the pertinent six year period, Biegel never asked anyone how a lender satisfied itself that the expenditure ceiling would not be surpassed during the three year period after the bond was issued.
 
 
 18
 Moreover, Biegel testified that at the time of the transaction in question he was unaware that Roosevelt Federal sold in the secondary bond market the tax-exempt bonds it held. As a result of his ignorance of Roosevelt Federal's dealings in the secondary market Biegel did not realize the significance of obtaining the opinion of nationally recognized bond counsel concerning the taxability of the interest on the bond.
 
 
 19
 Having set forth the parties' conceptions of the term "satisfactory evidence," we now turn to the specific events giving rise to this litigation.
 
 
 20
 In December, 1979 and January, 1980 Ronal Newbanks and Donna Goodenough simultaneously reviewed draft capital expenditure certificates prepared by Mark Scoblionko for completion by the three principal tenants of the shopping center and by Hershey Foods, a "person" related to Friendly Ice Cream within the meaning of I.R.C. Sec. 103(b)(6)(C). These proposed certificates stated as follows:
 
 
 21
 The aggregate amount of 'Section 103(b)(6)(D) capital expenditures,' as that term is defined in subdivision (ii) of the Income Tax Regulations Section 1.103-10(b)(2), together with the outstanding balance of any previous or subsequent tax-exempt issues involving the undersigned principal user or any related person as defined in Section 103(b)(6)(C) with respect to property in Lehigh County, Pennsylvania, outside of incorporated municipalities, is and will remain Ten Million Dollars ($10,000,000.00) or less. It is understood that 'capital expenditures' includes aggregated capital expenditures for all 'principal users' (or any related persons as defined in Section 103(b)(6)(C)) which were paid or incurred during the six (6)-year period which begins three (3) years before the date of issuance of the Note and ends three (3) years after such date and refers to facilities located in all areas of Lehigh County, Pennsylvania, outside of incorporated municipalities.
 
 
 22
 Although Newbanks acknowledged that the Scoblionko draft certificates were "generally satisfactory" and were similar to certificates approved in other unrelated tax-exempt financings, he stated that he would have insisted that each of the principal tenants and related parties in the Lehigh County project submit a certificate containing an agreement to limit capital expenditures for the requisite six year period to a specific dollar amount before rendering an unqualified approving opinion.[13] Maynard Holcombe's testimony also indicates that he believed that the Scoblionko drafts were satisfactory in general rather than specific terms. Holcombe characterized the statement in the drafts that aggregate capital expenditures would not exceed ten million dollars as a "bare-bones representation." Noting that Newbanks was the arbiter of a project certificate's sufficiency, he added, "This is not the kind of representation in specific language that we would normally prepare.... [I]t would be probably minimally adequate in the sense that it includes a representation going forward in time[,] [that is, a representation concerning future capital expenditures]." In addition, Goodenough expressed her concern that the draft documents did not contain any "indication or statement to limit future expenditures to a specific dollar amount."
 
 
 23
 In late January, 1980, after Newbanks and Goodenough reviewed the capital expenditure certificates drafted by Scoblionko, Goodenough advised Alan Biegel that the certificates were unacceptable because they did not contain specific limitations of future capital expenditures.[14] At about the same time Hershey Foods and Weis Markets informed Biegel of their own objections not only to the language of the Scoblionko drafts dealing with future capital expenditures[15] but to any certificate requiring them to unqualifiedly agree to limit such expenditures for the requisite three year period.[16]
 
 
 24
 Counsel for Aries initially notified Newbanks and Roosevelt Federal of Hershey's refusal to provide assurances that its capital expenditures would not jeopardize the tax-exempt status of the bond in a letter dated January 25, 1980. This letter stated,
 
 
 25
 [Hershey has] agreed to provide the certification relative to what [it has] done in the past or what [it will do] over the next three years but [it] will not agree to in any way limit [itself] in terms of the $10,000,000 limit. Apparently, [Hershey] feel[s] that [it is] agressive [sic ] from an acquisition point of view and fear[s] that [it] may end up purchasing another corporation over the next three years which could well have assets in the Lehigh County area which would cause a violation of the limitation thus rendering [it] possibly liable to Aries for any acceleration in the interest .... [Counsel for Hershey] indicated to me that the position of Hershey is rigid in this respect and no amount of negotiation on our part is going to change this.
 
 
 26
 After learning that Hershey had refused to execute the necessary certificate, Newbanks advised John Pollaci that he could not render an unqualified approving opinion. Bond counsel testified, however, "I indicated to [Roosevelt Federal] I could give them a qualified opinion, although it's not our practice to do so, and it certainly was not their practice to accept one." Pollaci then assessed the risk of loss to Roosevelt Federal resulting from taxable interest on the loan[17] and the difficulty, if not impossibility, of selling the loan in the secondary market. After determining that it was unlikely that capital expenditures by Hershey Foods during the three years after closing would imperil the tax-exempt status of the bond, Pollaci decided to proceed with the loan agreement. This decision, however, was conditioned upon obtaining Aries' consent to an amendment of the commitment agreement giving Roosevelt Federal the right to demand immediate and full payment of the loan in the event the ten million dollar capital expenditure limit was exceeded.
 
 
 27
 Before the parties had an opportunity to renegotiate the loan repayment provision, Weis Markets informed Aries that it would sign a project certificate only if the certificate excluded expenditures for acquisitions of businesses and land within the restricted area of Lehigh County. Despite Biegel's efforts to persuade Weis to reconsider its position, Weis remained intransigent. On February 21, 1980 Biegel advised Roosevelt Federal of Weis' refusal to capitulate. On the same day, appellant Jackson discussed the situation with Pollaci, who stated that the Weis certificate was a prerequisite to proceeding with the loan. Jackson followed up the conversation with a letter dated February 22 that stated,
 
 
 28
 On behalf of Aries ... I wish to express my sincere disappointment in the attitude of your association in revoking the ... commitment. It is my understanding that the telephone conversation between John Pollachi [sic ] and myself on February 21, 1980 constituted such a revocation.
 
 
 29
 * * *
 
 
 30
 * * *
 
 
 31
 From my point of view, I believe that we satisfied every term or condition of your commitment. I assume that you are relying upon Item 4 of the special conditions .... You have requested some form of satisfactory evidence indicating that the loan will be tax exempt for its life and it simply is not available.... I assume what you are attempting to indicate was that you wanted some form of iron clad agreements but even they will not guarantee tax exemption for life. Nothing can provide such a guarantee and that is the reason we do not believe that you are justified in terminating your commitment.
 
 
 32
 Upon receiving Jackson's letter Pollaci immediately forwarded it to Newbanks for his comments. Newbanks responded by stating,
 
 
 33
 As we advised you on the telephone, your Special Condition No. 4 of the ... commitment reflects nothing more than the standard requirements of a tax-exempt loan, i.e., that the transaction be properly documented. We believe that the 'life of the loan' language must be read in context to require ... documentation [pertaining to the statutory six year period] and not permanent tax exemption. Moreover, you have never required (and did not in [this] transaction) more than the customary documentation.
 
 
 34
 * * *
 
 
 35
 * * *
 
 
 36
 In [this] case ..., you agreed to more than was required when Hershey refused to furnish a certificate and you certainly are entitled to balk when a second principal user refuses to limited [sic ] its expenditures.[18] As you know, expenditures by way of acquisition count toward the $10,000,000 limit to the same extent as construction or other capital expenditures. To the extent that you intend to make a tax-exempt loan, you jeopardize that intent if you cannot be assured of compliance with the capital expenditure limitation.
 
 
 37
 Bond counsel also enclosed a draft response to Jackson's letter of February 22 that was adopted verbatim by Pollaci in his March 10 reply to Jackson. Pollaci's reply advised as follows:
 
 
 38
 I did not indicate to you ... that Roosevelt Federal intended to cancel its commitment. In fact, as you know, the commitment remains open and may be delivered against until September 30, 1980, assuming the conditions of the commitment are complied with.
 
 
 39
 The language of Special Condition No. 4 is merely intended to reflect the usual requirement in this type of transaction--that the proper documentation is in place at the initial closing of a transaction to evidence tax-exemption at that time and to ensure, to the extent possible, that the loan will not become taxable as a result of action such as overspending by the developer or the tenants of a project. Obviously, we do not require any guarantees of tax exemption for the life of a loan. We have never encountered any difficulty in obtaining certificates from each principal tenant in a project stating their prior (3 years) capital expenditures and also agreeing that they will limit their capital expenditures over the next three years to a specified amount .... In an effort to accommodate you, we made a conscious business judgment to assume the risk of taxability and proceed when we learned Hershey would not execute a certificate. Thereafter, we learned that Weiss [sic ] also refused to limit capital expenditures resulting from acquisitions and our loan committee concluded that we could not accept this additional risk.
 
 
 40
 ... We are willing to proceed without a Hershey certificate, but do not wish to close without a capital expenditure certificate from Weiss [sic ].
 
 
 41
 We value our relationship with you and hope that the Weiss [sic ] problem can be resolved ....
 
 
 42
 The final letter in the flurry of correspondence among the participants in this financing transaction was written by appellant Jackson on March 26, 1980. Jackson reiterated his earlier statement that no documentation could guarantee that the loan would remain tax-exempt after closing. In addition, he advised Roosevelt Federal of his belief that it was responsible for the losses suffered by the partnership as a result of its inability to proceed with the shopping center development.[19]
 
 
 43
 Although the loan commitment was held open until September 30, 1980 at Pollaci's instructions, Aries took no steps to submit "satisfactory evidence" after the final exchange of correspondence with Roosevelt Federal.[20] Consequently, the commitment expired by its terms on that date.
 
 
 44
 Appellants filed their complaint alleging breach of the loan commitment agreement on December 30, 1980. Roosevelt Federal thereafter moved for summary judgment, which was denied on June 25, 1981. In denying Roosevelt Federal's motion the district court stated:
 
 
 45
 There is no question that plaintiffs have not submitted certificates that have met defendant's approval. The dispute, however, is over the interpretation of Special Condition No. 4. Plaintiffs state that they understood this condition to require 'statements' of intended future capital expenditures and ... that they were in a position to supply this. Plaintiffs argue that defendant unilaterally altered the requirements of this condition to require firm and binding 'agreements' from all principal users with respect to future capital expenditures.[21] Plaintiffs suggest that defendant altered the requirements because of soaring interest rates in the hope plaintiffs would be unable to comply, thereby allowing defendant to get out of an unprofitable loan commitment.
 
 
 46
 Defendant argues that Special Condition No. 4 is nothing more than a request for customary documentation, that plaintiffs failed to provide such documentation, and that no material facts are in dispute. The Court does not agree. The wording of Special Condition No. 4 is not so precise as to leave no room for interpretation. Indeed, the parties do disagree on the requirements of the condition. Under these circumstances, the Court believes it would be improper to enter judgment at this juncture of the proceedings.
 
 
 47
 Aries Gottlieb Allentown Joint Venture v. Roosevelt Federal Savings & Loan Association, No. 80-1634-C(C), slip op. at 2-3 (E.D.Mo. June 25, 1981).
 
 
 48
 After substantial discovery, Roosevelt Federal renewed its request for summary judgment. The district court granted the motion, stating,
 
 
 49
 [T]his Court believes that the ambiguities which once may have existed with respect to Special Condition No. 4 are no longer present. There now appears to be no issue of material fact concerning whether plaintiffs satisfied that condition. They clearly did not. Their failure to do so constituted an unexcused breach of a condition ... of their loan agreement with Roosevelt Federal, and this breach discharged any duty by Roosevelt Federal to provide the loan. [Citations omitted.]
 
 
 50
 Jackson v. Roosevelt Federal Savings & Loan Association, No. 80-1634-C(C), slip op. at 1-2 (E.D.Mo. Jan. 12, 1982).
 
 
 51
 On appeal, Aries initially proceeds on the premise that the language of Special Condition No. 4 is ambiguous, that is, it "is reasonably susceptible of more than one construction." Champale, Inc. v. Joseph S. Pickett & Sons, Inc., 599 F.2d 857, 859 (8th Cir.1979); see Busch & Latta Painting Corp. v. State Highway Commission, 597 S.W.2d 189, 198 (Mo.App.1980). Appellants contend that the evidence adduced during discovery highlighted rather than resolved the ambiguity since it established the parties' different yet tenable constructions of the phrase "satisfactory evidence." On this basis appellants argue that the district court could not properly dispose of the case at hand on a motion for summary judgment. See Champale, Inc. v. Joseph S. Pickett & Sons, Inc., 599 F.2d at 859.
 
 
 52
 We reject appellants' argument in this regard. We have previously stated that "[d]isputes involving the interpretation of unambiguous contracts are appropriate cases for summary judgment." Champale, Inc. v. Joseph S. Pickett & Sons, Inc., 599 F.2d at 859 (quoting Parish v. Howard, 459 F.2d 616, 618 (8th Cir.1972)). Any ambiguity in the language of the special condition at issue here was resolved by resort to extrinsic evidence. The voluminous record before us establishes beyond peradventure that "satisfactory evidence" consisted of the opinion of nationally recognized bond counsel that the proposed bond issue would be tax-exempt. Further, the record shows that bond counsel's opinion could be rendered only after examining signed project certificates containing a report of actual capital expenditures for the three year period before the bond issuance date and an agreement limiting such expenditures to a specified amount for the three year period following that date. In these circumstances the district court correctly concluded in ruling on Roosevelt Federal's renewed motion for summary judgment that "the ambiguities which once may have existed with respect to Special Condition No. 4 [were] no longer present." Jackson v. Roosevelt Federal Savings & Loan Association, supra, slip op. at 1.
 
 
 53
 Appellants urge a second ground for reversal of the district court's order. They contend that the trial court improperly measured Roosevelt Federal's satisfaction with the evidence of tax-exempt status against a subjective standard, that is, one allowing the lender to exercise its discretion and business judgment. Appellants advocate the application of an objective (reasonable man) standard in determining whether the evidence in question was satisfactory.
 
 
 54
 It is unnecessary in the circumstances of this case to decide whether a subjective or an objective standard governs a lender's evaluation of evidence of tax exemption submitted by a borrower pursuant to a loan commitment agreement conditioning the lender's performance on its satisfaction with such evidence.[22] As we have noted, Aries was required to submit to Roosevelt Federal capital expenditure certificates signed by the three principal tenants of the proposed shopping center stating actual expenditures for the three years before closing of the long-term loan and limiting such expenditures to a prescribed sum for the three years after closing. Aries, however, submitted no evidence of tax exemption that could be deemed satisfactory under any standard. The certificates tendered to Roosevelt Federal, if they were tendered at all, were clearly deficient. It is apparent from the evidence of record that these deficiencies were not, and indeed could not, be remedied.
 
 
 55
 We conclude that the district court correctly determined that no issue of material fact concerning Aries' compliance with Special Condition No. 4 was presented and that summary judgment should be entered. That judgment is affirmed.
 
 
 
 [1]
 The Honorable James H. Meredith, United States Senior District Judge, Eastern District of Missouri
 
 
 [2]
 The applicable portion of section 103, I.R.C. Sec. 103(b)(6)(D), provides that gross income does not include interest on any obligation, specifically, any industrial development bond, issued as part of an issue the aggregate authorized face amount of which is $10,000,000.00 or less and substantially all the proceeds of which are used, inter alia, for the acquisition or improvement of property, provided that the aggregate of (1) the face amount of the bond, (2) the outstanding balance of any prior tax-exempt issue(s) relating to facilities located in the same incorporated municipality or in the unincorporated area of the same county and used by the same principal users or "related persons," id. Sec. 103(b)(6)(C), and (3) the capital expenditures paid or incurred by all principal users or related persons within the previously enumerated areas during the six year period beginning three years before the bond issuance date and ending three years after this date does not exceed $10,000,000.00. See Treas.Reg. Sec. 1.103-10(b)(2)
 
 
 [3]
 The role of Roosevelt Federal as the long-term lender was only one of several played by the various participants in this financing transaction. Aries also applied to Industrial National Bank of Providence, Rhode Island for a tax-exempt short-term construction loan. After the partnership obtained the financing commitments of both lenders, it requested appropriate action by the issuing public body, the Lehigh County Industrial Development Authority (LCIDA), which authorized a $2,550,000.00 bond issue in November, 1979
 
 
 [4]
 The modified draft of the loan commitment agreement signed on September 17, 1979 referred to the special conditions, but it is unclear from the record before this court whether the addendum containing the special conditions was actually provided to Aries at that time
 
 
 [5]
 Newbanks had extensive experience in the practice of municipal bond law. He testified that he had served as either bond counsel or counsel in at least 300 tax-exempt financings since 1974. For a discussion of the difference between the role of bond counsel and counsel see n. 7 infra
 
 
 [6]
 We note that the loan commitment agreement issued on October 17, 1979 by the original construction lender, Industrial National Bank of Rhode Island, also required that Industrial National receive before closing "an unconditional opinion of nationally recognized bond counsel to the effect that all interest on the construction loan is exempt from Federal income taxation." The loan commitment issued on February 5, 1981 by The Provident National Bank of Philadelphia, Pennsylvania, the second lender to which appellants applied for tax-exempt short-term (construction) financing after their unsuccessful attempt to obtain project financing from Industrial National and Roosevelt Federal, likewise mandated "an opinion in form and substance satisfactory to [Provident National] that interest on the Tax Exempt Note is exempt from federal income tax from counsel with expertise in industrial revenue bonds acceptable to [Provident National]."
 
 
 [7]
 During his deposition Newbanks also explained the role of counsel, as opposed to bond counsel, to a lender in a tax-exempt financing. He stated that while the primary responsibility of bond counsel is to render an approving opinion concerning the tax-exempt character of the bond issue, counsel to a lender is charged with the responsibility of reviewing all the documentation connected with the financing transaction
 
 
 [8]
 Jackson testified that none of the other Aries partners had any previous experience in tax-exempt industrial development bond financing
 
 
 [9]
 See n. 2 supra
 
 
 [10]
 With respect to the three year period preceding the bond issuance date, Jackson acknowledged that the capital expenditure certificates must state the specific capital expenditures of Aries, the three major tenants, and any related persons for the applicable period
 
 
 [11]
 We note that there is no direct evidence in the record before this court either corroborating or contradicting appellant Jackson's assertion concerning the LCIDA's criteria for approving the bond issue
 
 
 [12]
 At the time of his conversation with Scoblionko concerning the necessary steps to obtain the LCIDA's approval of the bond Jackson was aware of the language contained in the Industrial National commitment agreement stating that the construction lender must receive "an unconditional opinion of nationally recognized bond counsel" that the interest on the construction loan was tax-exempt, see n. 6 supra. The following deposition testimony, however, indicates that appellant was unaware of the significance of obtaining the opinion of bond counsel listed in the Red Book or of the existence of the Red Book itself:
 Q. You told me Mr. Scoblionko did not explain to you what bond counsel was, and these words, in [the Industrial National] commitment, called for receipt of an unconditional approving opinion of nationally recognized bond counsel. Did you think you had an understanding of what that meant from your conversation with Mr. Scoblionko?
 A. Yes. I assumed that he was as competent as any nationally recognized bond counsel on the basis that I didn't know that there was a difference, and Mr. Scoblionko was the attorney for the Authority, and these were the people who were charged with ... [authorizing] tax-free bonds.
 Q. At that point, did you note [sic ] that the Red Book existed?
 A. No....
 
 
 [13]
 During Newbanks' deposition, counsel for appellants in the present action handed him a copy of capital expenditure certificates executed by Bonanza International, Inc. and Sports Arena, the principal users of a facility in Manistee County, Michigan for which Roosevelt Federal also provided long-term financing through the use of a tax-exempt industrial development bond. Counsel for appellants queried Newbanks concerning the reason why the covenants in these certificates contained only a general statement that the aggregate capital expenditures of the principal users would not exceed the ten million dollar ceiling rather than a statement limiting capital expenditures paid or incurred in the future to a specified amount. Noting that another firm had served as bond counsel for Roosevelt Federal in the Michigan transaction, Newbanks replied, "My assumption is ... that bond counsel had no indication or reason to believe that any further limitation was necessary based upon discussions with either the developer or the principal users in that particular transaction."
 
 
 [14]
 Goodenough stated that at this point she believed that Newbanks was revising the Scoblionko drafts. She acknowledged, however, that neither she nor anyone else associated with Roosevelt Federal asked Newbanks to draft acceptable certificates. Indeed, Holcombe testified at his deposition that neither he nor Newbanks drafted any capital expenditure certificates during the course of this transaction. We note that Goodenough also stated that no draft project certificates other than those prepared by Scoblionko were submitted to Roosevelt Federal or to Roosevelt Federal's bond counsel for review
 
 
 [15]
 Evidently, Biegel had provided the three major tenants and Hershey Foods with copies of the draft certificates after receiving them from Scoblionko in December, 1979
 
 
 [16]
 For example, Hershey and Weis also refused to sign proposed capital expenditure certificates prepared by the firm of Edwards & Angell of Providence, Rhode Island, which served as bond counsel for Industrial National Bank. These draft certificates stated,
 [T]he Tenant agrees that neither it nor any Related Person will, until the expiration of the period of three years after the date of the last advance made with respect to the Note, pay or incur any obligation to pay for capital expenditures, as defined in Section 103(b)(6)(D)(ii) of the Code, with respect to the Project or other facilities of the Tenant or any Related Person which may be located in the future in Lehigh County, Pennsylvania outside of incorporated municipalities, if the aggregate of such capital expenditures during that period, together with capital expenditures of other principal users and the total amount of advances made on the Note would exceed the applicable limitation set forth in Section 103(b)(6)(D) of the Code.
 We note that during pretrial discovery counsel for Roosevelt Federal in the instant action sought, but failed to obtain, an explanation why this additional set of certificates was prepared by bond counsel for Industrial National, who was aware that Scoblionko was drafting a set of project certificates. Ordinarily, the same set of signed certificates is submitted to the issuer of the bond and the construction and long-term lenders.
 
 
 [17]
 As long as the loan remained tax-exempt the interest rate set by the loan commitment agreement was 8.375 per cent per year. An escalated rate of 10 1/4 per cent was triggered by exceeding the ten million dollar ceiling. In this regard, Special Condition No. 6 of the commitment agreement stated, "Documentation providing that any loss of federal tax exemptions subsequent to loan closing by Roosevelt Federal will result in the rate of interest on the remaining balance to be increased to 10- 1/4%." We note that Donna Goodenough testified that the adjusted interest rate offered only partial protection against loss to Roosevelt Federal. She stated, "[I]f Roosevelt Federal had made this loan as a taxable commercial loan, it would have had to set the interest rate at 11.96 percent to obtain the same after-tax yield as the proposed tax-exempt loan."
 
 
 [18]
 Newbanks testified that while he would have given a qualified opinion after Hershey refused to sign a project certificate, "when we learned that Weiss [sic ] would not give a capital expenditure certificate, a decision was made that the loan could not be made because the opinion at that point probably would not have been forthcoming even if Roosevelt had decided to go ahead."
 
 
 [19]
 Pointing out that the 8.375 per cent rate of annual interest provided in the loan commitment agreement was substantially below the prevailing interest rate, Jackson also insinuated that Roosevelt Federal was attempting to extricate itself from the financing agreement as a result of the sharply increasing interest rates. Three witnesses for Roosevelt Federal refuted this suggestion. Donna Goodenough pointed out that the Aries loan was one of many tax-exempt offerings with identical or slightly lower interest rates included in the January, 1980 issue of "Nationwide Notes," a Roosevelt Federal newsletter sent to several hundred lending institutions offering them the opportunity to purchase the loans listed from Roosevelt Federal in the secondary market. John Pollaci noted that during his employment at Roosevelt Federal, the lender did not institute a policy of withdrawal from the tax-exempt bond market despite the virtual impossibility of selling a tax-exempt loan bearing interest at the rate of 8.375 per cent per year at face value in the secondary market in September, 1980. Pollaci also stated his personal belief in the viability of the tax-exempt market. Finally, Ronal Newbanks stated that he was unaware of any attempt by Roosevelt Federal to abandon a loan because of an upward shift in interest rates
 
 
 [20]
 We note that the record contains one set of capital expenditure certificates signed by the three principal tenants of the proposed shopping center. Appellant Jackson testified that he personally mailed the certificate executed by White Cross Stores, Inc. to Donna Goodenough in February, 1980. When counsel for Roosevelt Federal in the instant action pointed out that the certificate was dated March 15, Jackson merely stated that it was actually signed in February. In discussing the project certificate signed by Friendly Ice Cream on February 21, 1980, Jackson stated that it was forwarded to Goodenough in February by Gail E. McCann, an attorney with the firm of Edwards & Angell. As to the Weis certificate, dated March 6, 1980, Jackson indicated that Alan Biegel mailed it to Roosevelt Federal evidently in February. When questioned concerning the discrepancy between the two dates Jackson responded that the certificate was executed sometime before March. In testifying concerning the same set of capital expenditure certificates Biegel stated that he "thought" the signed certificates were provided to Roosevelt Federal, but denied personally mailing any of them
 Although it is unclear from the record whether Roosevelt Federal ever received any of these certificates, in the circumstances of this case it is of no consequence since both the Friendly and Weis certificates contained unacceptable exclusions of certain capital expenditures. Specifically, the Friendly certificate excluded capital expenditures made by Hershey Foods, and the Weis certificate excluded expenditures for acquisitions of businesses and land in the restricted area of Lehigh County during the three years after closing of the long-term loan. Upon examining these certificates for the first time at his deposition Newbanks stated that he could not have rendered an unqualified approving opinion because of the exclusions contained therein. Moreover, we note that Jackson testified that he was aware at the time Friendly and Weis signed these certificates that they did not include all the expenditures that must be counted in determining whether the ten million dollar spending limitation would be exceeded.
 
 
 [21]
 Appellants' argument was evidently based on the affidavits of Jackson and Biegel submitted in opposition to Roosevelt Federal's motion for summary judgment. Both these affidavits referred to an "understanding" that only a statement of anticipated capital expenditures need be submitted with respect to the three year period after the bond was issued
 
 
 [22]
 We note that the modern rule appears to favor the application of a subjective standard in the context of complex financial transactions. See Hendrix v. Sidney M. Thom & Co., 271 Ark. 378, 609 S.W.2d 98 (Ark.App.1980); Rodriguez v. Barnett, 52 Cal.2d 154, 338 P.2d 907 (Cal. en banc 1959); Mattei v. Hopper, 51 Cal.2d 119, 330 P.2d 625 (Cal. en banc 1958); Larwin-Southern California, Inc. v. JGB Investment Co., 101 Cal.App.3d 626, 162 Cal.Rptr. 52 (Cal.Ct.App.1979); Commercial Mortgage & Finance Corp. v. Greenwich Savings Bank, 112 Ga.App. 388, 145 S.E.2d 249 (Ga.Ct.App.1965); 451 Corporation v. Pension System for Policemen and Firemen, 310 N.W.2d 922 (Minn.1981); Omni Group, Inc. v. Seattle-First National Bank, 32 Wash.App. 22, 645 P.2d 727 (Wash.Ct.App.1982). It is clear that under a subjective standard, an objective criterion--good faith--controls the exercise of the right to determine satisfaction. E.g., Hendrix v. Sidney M. Thom & Co., 609 S.W.2d at 101; Larwin-Southern California, Inc. v. JGB Investment Co., 162 Cal.Rptr. at 58-59; Commercial Mortgage & Finance Corp. v. Greenwich Savings Bank, 145 S.E.2d at 251; 451 Corporation v. Pension System for Policemen and Firemen, 310 N.W.2d at 925