**451 CORPORATION, et al., Appellants,**

v.

**PENSION SYSTEM FOR POLICEMEN AND FIREMEN OF the CITY OF DETROIT, et al., Respondents,**

**F. T. Fish and F. T. Fish and Associates, Defendants.**

No. 51821.

Supreme Court of Minnesota.

Oct. 16, 1981.

Rehearing Denied Nov. 25, 1981.

Gray, Plant, Mooty, Mooty & Bennett and Curtis Forslund and George Soule, Minneapolis, for appellants.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan and John Richard Bland, Minneapolis, for respondents.

SIMONETT, Justice.

Plaintiffs sued for damages for breach of a contract to make a mortgage loan. The trial court ordered judgment for the defendants and plaintiffs appeal. We find the contract was unenforceable since a condition for its performance was not met, and we affirm.

Plaintiff 451 Corporation is a Minnesota corporation that acquired ownership of a large office-warehouse building in Minneapolis in 1972. The corporation is owned by plaintiffs Oliver Dyste and Arthur Mueller. When acquired, the property was subject to a short-term construction mortgage and it was necessary for Dyste and Mueller to obtain permanent, long-term financing. Plaintiffs claim they had successfully negotiated a contract for the long-term financing with defendant Pension System for Policemen and Firemen of Detroit, more commonly known as the Detroit Pension System or DPS, but that at the closing on March 27, 1974, DPS reneged and refused to make the agreed upon $3.45 million mortgage loan.

The issues on appeal are whether there was a contract; if so, whether conditions to its performance were met; if there was a binding contract, does the Statute of Frauds preclude its enforceability; and did the trial court err in finding plaintiffs suffered no damages? We reach only the first two questions.

Plaintiffs were having trouble locating mortgage financing in 1973 when, through an officer of IDS Mortgage Corporation, they met with Frederick Fish, an independent mortgage broker from Boston. Fish represented to plaintiffs he could probably

obtain a loan from DPS, the Detroit Pension System. DPS is an entity established by the charter of the City of Detroit to invest funds for pensions for personnel of the Detroit police and fire departments.

In early 1974 Fish proposed to DPS that it issue a $3.45 million mortgage to 451 Corporation, the mortgage to be for a 20-year term but based on a 35-year amortization table. On March 7, upon Fish's recommendation, the Board of Trustees for the Detroit Pension System duly adopted a resolution approving the mortgage loan "subject to approval of the documents as to legality and form by the Office of the Corporation Counsel." On March 14, the board voted to authorize three board members to represent the board and act as signatories at the closing. Acting as attorney for DPS was Nicolas Sacorafas, assistant corporation counsel in the Office of the Corporation Counsel for the City of Detroit. Plaintiffs were advised the pension board had adopted the March 4 resolution to make the loan but no formal written mortgage commitment was issued by DPS. Negotiations to implement the board's resolution continued between DPS and 451 Corporation, with Sacorafas and broker Fish retaining Minneapolis counsel to represent DPS locally. Two members of the pension board traveled to Minneapolis shortly before closing, met with Dyste and Mueller, and visited the building site.

On March 19, attorney Sacorafas talked with Harry Iwasko, an assistant attorney general for the State of Michigan, who was the legal advisor of the Michigan Insurance Bureau. The Insurance Bureau apparently has supervisory jurisdiction over public pension funds in Michigan such as DPS. Iwasko gave Sacorafas a handwritten note stating that the 35-year amortization period violated a Michigan statute requiring pension funds to be invested in mortgages with no more than a 30-year amortization period. Iwasko testified at the trial by deposition that he also told Sacorafas that any "balloon-payment" type of mortgage would be contrary to Michigan law.

Sacorafas reported to plaintiffs' attorney on his meeting with Iwasko. As a result, 451 Corporation made a new proposal which

was presented to DPS, and on March 21 the DPS board adopted the following revised resolution:

RESOLVED, That the Board of Trustees of the Policemen and Firemen System approves the investment of $3,450,000 in a first mortgage loan on a completed office-warehouse located in northeast Minneapolis, Minnesota, owned by the 451 Corporation. The loan will have a mortgage constant of 9.56 whereby the net yield to the Policemen and Firemen Retirement System will be not less than 8⅞% interest per annum *for a twenty year term with a 30 year amortization table.* The loan will be closed to pre-payment for the first five years, 10% penalty thereafter declining 1% per year to a minimum of 1%; however, in the event the existing lessee exercises its option to buy the premises at the fifth anniversary date of said lease, no pre-payment penalty shall be required. The Board of Trustees will have the option to call the loan at the end of the fifth year, the tenth year, and the fifteenth year. *Said mortgage loan is subject to approval of the documents as to legality and form by the Office of the Corporation Counsel,* and be it further

RESOLVED, That the City Treasurer be and he is hereby authorized and directed to wire funds in the amount of $3,450,000 to the Title Insurance Company of Minnesota, Account No. 5005579, at the time of the closing.

(Emphasis added.)

The revised resolution, it is clear, brought the mortgage within the 30-year limit but did not cure the balloon-payment problem raised by Iwasko. As in the earlier resolution, the revised version also contained the proviso it was subject to approval of the documents as to legality and form by DPS' counsel. Although Dyste and Mueller testified they never received written confirmation of the March 21 resolution, attorney Sacorafas continued to confer with Dyste and Mueller and their attorney during the week of March 21 through 26.

The loan closing was scheduled for March 27, 1974, in Minneapolis. Two pension board members came to Minneapolis, executed a UCC Financing Statement prior to the closing, but did not show for the closing. The executive secretary for the pension board, scheduled to be at the closing, never left Detroit. Dyste and Mueller attended the closing with their attorney, and attorney Sacorafas was present with DPS' local counsel. After Mueller and his wife signed the mortgage note, Sacorafas was called to the telephone. Sacorafas then returned to the room and announced that pursuant to the instructions of Detroit's city controller, Dennis Green, the mortgage loan would not be made. Plaintiffs testified that Sacorafas said the loan was being cancelled because it was "a bad deal" and that there was disagreement between the pension board and the city authorities.

We first must consider whether there was a contract. Plaintiffs' proposal to borrow funds was an offer, but the parties differ as to whether there was ever an acceptance by DPS. The trial court found: "There never was a legal acceptance of a proposal to make a mortgage loan by DPS, and, accordingly, there was no breach of any alleged agreement." Plaintiffs say there was an acceptance by DPS, consisting of one or more of the following: DPS' board resolutions of March 7 and 21; the March 17 resolution authorizing signatories; the negotiations with DPS' attorney Sacorafas over the terms of closing; and the appearance of DPS' attorneys at the closing, together with the signed UCC Financing Statement. DPS, on the other hand, claims these events were only negotiations looking forward to making a contract and that until a formal mortgage commitment letter was issued by DPS (and one never was) there was no contract.

■ Negotiations for a contract do not constitute a contract in themselves. *Gans v. Coca Cola Bottling Co.*, 205 Minn. 36, 284 N.W. 844 (1939). A party can accept a contract either by communicating directly to the offerors or by words or actions put into a form which is in fact communicated to the offeror before revocation. *Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962). It is enough if the offeror receives notification of the offeree's acceptance. *Sawyer v. Mutual Life Ins. Co.,* 166 Minn. 207, 207 N.W. 307 (1926).

It seems to us the revised March 27 resolution of the pension board might well have constituted an acceptance of 451 Corporation's proposal; the terms were definite and the resolution declared the board's resolve to make the mortgage loan. If this acceptance was communicated to 451 Corporation—say by attorney Sacorafas, as agent for DPS—a contract would be formed. While no formal mortgage loan commitment letter was ever issued by DPS, it does not appear the parties considered this essential to formation of a contract. The resolution itself makes no mention of a commitment letter. On the other hand, the letter might be considered the recognized means by which DPS' acceptance of 451 Corporation's offer was to be communicated to 451.

■ We need not decide, however, if a contract was formed. The March 27 resolution expressly provided: "Said mortgage loan is subject to approval of the documents as to legality and form by the Office of the Corporation Counsel." This approval was never obtained. The trial court so found, and we cannot say its finding is clearly erroneous. Minn.R.Civ.P. 52.01. There is adequate evidence to support the finding. Because of the Michigan Attorney General's opinion that the loan terms were illegal, attorney Sacorafas' superiors withheld loan approval and ordered the pension board's executive secretary not to go to Minneapolis for the closing.

The requirement of loan approval by the Office of Corporation Counsel can be considered either as a condition precedent to formation of a contract, or as a condition subsequent to a contract already formed. We need not decide which it should be, since whichever way the condition is characterized, if the event required by the condition does not occur, there can be no breach of contract.

Appellants attempt to neutralize the condition by claiming the requirement of counsel's approval of the loan did, in fact, occur,

or if it did not, it was either waived or not required (only approval of the documents and not the loan itself was contemplated); and that, in any event, the loan was disapproved for an invalid reason. We do not find any of these arguments persuasive.

Appellants first argue the mortgage loan terms are legal under Michigan law and that, presumably, the assistant attorney general was in error. Appellants cite numerous authorities, state and federal, plus the administrative practice of the Michigan Insurance Bureau of apparently never having challenged a loan with a balloon payment. DPS cites the contrary opinions of bond counsel from Detroit and of Iwasko. Neither party can point to an authoritative Michigan court holding. The trial court concluded the proposed loan was illegal.

We need not decide the legality of a balloon-payment mortgage under the Michigan statute, since that is not the issue before us. Performance of the agreement was dependent not on whether a court would conclude the loan legal or illegal but on whether the Office of Corporation Counsel would. In *Boyd v. Hallowell*, 60 Minn. 225, 230, 62 N.W. 125, 127 (1895), where a land transaction depended on whether title was satisfactory to buyer's attorney, we said, "[W]here parties select an arbiter or umpire of title, and he exercises his best judgment, in good faith, and with an honest intention of determining the question as to the validity of the title, his conclusion is final and binding. The courts have no power to revise it."

Here the Office of Corporation Counsel was required to exercise its best judgment in a reasonable manner, in good faith and with honest intent as to whether the loan agreement was legal. This was done. Corporation Counsel could, reasonably and in good faith, be of the opinion a balloon payment was not authorized. The Detroit Pension System did not agree to buy a lawsuit to prove otherwise.[1]

Plaintiffs further argue that the approval required by Corporation Counsel is only of the documents, *i. e.*, a determination only if the papers conformed to the agreement as made and were in proper legal form. We think this takes too narrow a view. The legality of the documents depends on the legality of the agreement which they reflect.

Plaintiffs also contend that DPS did not cancel the agreement because of any purported illegality but only because it was a "bad deal"; this, however, was a fact issue decided adversely to plaintiffs by the trial court. Nor can we say on this record that DPS, through the conduct of its attorney, Sacorafas, waived the contractual condition on legality.

We conclude, therefore, no action for breach of contract lies because DPS' contractual obligation to make the loan, if any, was discharged, since the condition to performance of the obligation never occurred. We need not reach the other issues raised on appeal.

Affirmed.

1. The Michigan statute, in relevant part, provides:

   [L]oans may be made in an amount not to exceed 75% of the appraised value of the real estate offered as security and for a term not longer than 30 years, if the real estate is improved * * * and if the loan is secured by an amortized mortgage, * * * under the terms of which the installment payments are sufficient to amortize the entire principal of the loan within a period of not more than 30 years.

   Michigan Comp.Laws Ann. § 500.942, subd. 4(c) (Supp.1981).