Raymond SCOTT, Respondent,

v.

FOREST LAKE CHRYSLER–PLYMOUTH–DODGE, petitioner, Appellant.

No. C4–99–161.

Supreme Court of Minnesota.

June 15, 2000.

Johnson & Van Vliet, L.L.P., Gregory J. Johnson, Klay C. Ahrens, St. Paul, for appellant.

Lommen, Nelson, Cole & Stageberg, P.A., Kay Nord Hunt, Minneapolis, Thomas J. Lyons, Jr., Consumer Justice Center, P.A., Thomas J. Lyons & Associates, P.A., Thomas J. Lyons, St. Paul, for respondent.

Amicus curiae James Schutjer, MADA Counsel, Minnesota Automobile Dealers Association, St. Paul.

## OPINION

STRINGER, Justice.

Respondent Raymond Scott traded in his 1988 Dodge Caravan on the purchase of a 1991 Dodge Caravan from appellant Forest Lake Chrysler–Plymouth–Dodge (Forest Lake) in a deal that required Scott to execute a vehicle purchase contract, a retail installment contract and a conditional delivery agreement. The conditional delivery agreement provided that if financing was not approved, the retail installment contract would be void. When financing was not approved by the initial lending institution, Forest Lake arranged for financing with a second lending institution at an increased annual percentage rate. Scott signed the financing documents and later brought suit alleging that Forest Lake violated Minn.Stat. § 168.71(a)(1) (1994) because the retail installment contract did not include the conditional delivery agreement in violation of the statutory requirement that a retail installment contract "shall contain all the agreements of the parties." The district court dismissed Scott's claim ruling that the use of a separate conditional delivery document did not violate the statute. The court of appeals reversed, holding that the failure to identify the condition precedent of financing approval in the installment contract violated Minn.Stat. § 168.71(a)(1). *See Scott v. Forest Lake Chrysler–Plym-*

*outh–Dodge*, 598 N.W.2d 713, 718 (Minn. App.1999). On review, we reverse.

On August 11, 1994, Scott and his wife went to Forest Lake, a new and used automobile dealership, to trade in their 1988 Dodge Caravan on the purchase of a 1991 Dodge Caravan for $15,257.00. Forest Lake agreed to give Scott a $6,000.00 trade-in allowance on their 1988 Dodge Caravan and to pay off the outstanding loan, and Scott executed a "Vehicle Purchase Contract" setting forth the terms of the sale. Above the buyer's signature, the purchase contract stated "THIS MAY BE A BINDING CONTRACT AND YOU MAY LOSE ANY DEPOSITS IF YOU DO NOT PERFORM ACCORDING TO ITS TERMS." The contract also stated, "If DEALER is arranging credit for YOU, this CONTRACT is not valid until * * * you accept[ ] the credit extended."

Since Scott was obtaining financing the sale, Forest Lake also prepared and Scott signed a "Retail Installment Contract and Security Agreement" (RIC I)[1] which provided that credit would be extended to him in the amount of $15,177.71 in 60 monthly payments of $335.39 at an annual percentage rate of 11.5% and Comerica Bank would be the lender. RIC I also stated "IMPORTANT: THIS MAY BE A BINDING CONTRACT AND YOU MAY LOSE ANY DEPOSITS IF YOU DO NOT PERFORM ACCORDING TO ITS TERMS."

Because of the possibility that financing might not be secured on the terms of RIC I, Scott also executed a "Conditional Delivery Agreement" which provided that if financing was not approved, RIC I would be null and void:

YOU, the undersigned Buyer and Co–Buyer, agree with ME, the Dealer, to incorporate the following terms by reference into the Motor Vehicle Purchase Contract and any Installment Sales Contract to purchase [the 1991 Dodge Caravan].

* * * *

YOU understand and agree that the vehicle has been delivered to YOU conditionally subject to approval of financing. If financing is not approved, I will notify YOU and YOU agree to immediately return the vehicle to ME. * * * If financing is not approved, any Installment Sales Contract executed for purchase of the above-described vehicle shall be null and void.

* * * *

[U]pon assignment of any Installment Sales Contract to a lending institution, the terms of this Agreement set out above shall automatically lapse.

YOU have read and understand this document, intend it to be a binding part of YOUR contract to purchase a motor vehicle and acknowledge receiving a copy of it.

Scott also executed a "Credit Reporting Disclosure" agreement permitting his credit application to be submitted to other financial institutions for consideration. The 1991 vehicle was delivered to Scott subject to approval of the financing terms set forth in RIC I.

Comerica Bank declined to finance the transaction as did several other financial institutions, so Forest Lake lowered the 1991 Dodge Caravan's price from $15,257 to $14,988 and Chrysler Credit Corporation accepted financing for a 60–month period with monthly payments of $384.27 and interest at an 18.4% annual percentage rate. The payments totaled $23,056.20. Forest Lake prepared and dated as August 11, 1994, a second installment contract (RIC II) with Chrysler Credit Corporation as the assignee which contained, in bold print, the annual percentage rate, finance charge and total sales price and, like RIC I, language stating that it may be a binding contract.

When Scott's wife called Forest Lake several days later to check on the status of

---

1. We refer to the two retail installment contracts at issue as RIC I and RIC II; when discussing retail installment contracts generally we do not abbreviate.

the transaction, she was told "we are close to getting the van financed, we are only about $1,000.00 away," and was assured there were no problems. Shortly thereafter, Forest Lake called Scott and requested that he return to the dealership to sign additional papers because financing had been arranged through a different bank. On August 23, 1994, Scott returned to Forest Lake and signed RIC II identifying the new financing institution and the new credit terms. In a letter to Forest Lake he later claimed that while he was not told by the Forest Lake representative that the financing terms had changed, his wife noticed and inquired about the change in interest rate before signing the contract and was told that the purchase price had been lowered to compensate for the higher interest rate.

Scott left the dealership immediately after signing RIC II but returned later that day when he realized that the increased interest rate would raise the total contract price by $2,932.80. He attempted to undo the sale but was told that his 1988 trade-in had been sold and that he had to keep the 1991 Dodge Caravan.

Scott brought suit against Forest Lake and Chrysler Financial Corporation in U.S. District Court on July 12, 1996, alleging violations of the Truth in Lending Act, 15 U.S.C. §§ 1601–1693 and violations of several Minnesota statutes including Minn. Stat. § 168.71(a)(1) (Minnesota Motor Vehicle Retail Installment Sales Act (MMVRISA)), Minn.Stat. § 325F.69 (1998) (Minnesota Prevention of Consumer Fraud Act), and Minn.Stat. § 325D.44 (1998) (Minnesota Deceptive Trade Practices Act). On July 3, 1997, the court dismissed

**2.** Chrysler Financial Corporation was dismissed from the action.

**3.** Scott also alleged that appellant violated the Minnesota Consumer Fraud Act and that appellant's actions constituted common law fraud.

**4.** In 1994, the statute provided:
Every retail installment contract shall be in writing, shall contain all the agreements

both the federal and state claims. *See Scott v. Forest Lake Chrysler–Plymouth–Dodge,* No. 3–96–671 (D.Minn. July 3, 1997).

In July of 1997 Scott commenced these proceedings in state court against Forest Lake and Chrysler Financial Corporation[2] and claimed, among other things,[3] that Forest Lake's failure to identify the condition precedent in the retail installment contract violated section 168.71(a)(1)[4] requiring that every retail installment contract "shall contain all the agreements of the parties" and entitled him to recover statutory penalties and reasonable attorney fees under Minn.Stat. § 168.75(b) (1998).

On cross motions for summary judgment, the district court granted Forest Lake's motion and dismissed Scott's lawsuit in its entirety. The court ruled that the intent of the MMVRISA to protect the consumer from undisclosed terms was met by Forest Lake's installment contract because all of the credit terms were contained in that document. The court also found that although the separate agreement made RIC I conditional, it did not contain any additional or contradictory financing terms.

On appellate review, a majority of the court of appeals panel reversed on this issue holding that the failure to identify the condition precedent relating to financing approval within the four corners of the installment contract violated the "agreement of the parties" requirement in Minn. Stat. § 168.71(a)(1). *See Scott,* 598 N.W.2d at 717–18. The court noted that although the conditional delivery agree-

of the parties, shall be signed by the retail buyer and seller, and a copy thereof shall be furnished to such retail buyer at the time of the execution of the contract.
Minn.Stat. § 168.71(a)(1). The statute was amended in 1996 to allow the dealer to furnish the copy of the contract signed by both parties to the purchaser within seven days of delivery of the vehicle. *See* Act of Apr. 2, 1996, ch. 414, art. 1, § 33, 1996 Minn. Laws 877, 894.

ment did not directly contradict the terms of RIC I, failure to obtain financing approval ultimately invalidated RIC I because it resulted in a $2,932.80 increase in the total contract price. *See id.* The court reasoned that because the failure to obtain financing approval led to an increase in the "cost of credit," the MMVRISA's purpose of informing the buyer of the cost of credit was not met and remanded the claim to the district court. *See id.* at 718, 721.[5]

■ Forest Lake argues that the "agreement of the parties" clause in the MMVRISA is not intended to require that *all* agreements between the seller and buyer be literally recorded in the retail installment contract, but rather its purpose is to prohibit separate or side agreements containing credit terms contradicting those in the retail installment contract. Thus, the retail installment contract merely identifies the credit terms the parties agree to if financing is approved, and the conditional delivery agreement functions as confirmation of the parties' understanding that the sale is contingent upon financing and is not enforceable if the condition does not occur.

■ Scott argues that RIC I was legally binding because it did not clarify that the purchase was contingent upon the dealer assigning the contract to a financing institution, and that allowing the seller to can-

cel the contract based on language in another agreement is contrary to the MMVRISA's purpose of protecting the consumer by requiring that the retail installment contract contain "all of the agreements of the parties." Characterizing the financing agreement as a condition precedent,[6] Scott argues that the "all the agreements of the parties" provision requires that it be included in the retail installment contract.

■ Summary judgment is appropriate when there are no genuine issues of material fact and either party is entitled to judgment as a matter of law. *See Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). We review questions of statutory interpretation de novo, *see State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695, 701 (Minn.1996), and our primary objective is to ascertain and effectuate the legislature's intent. *See Boutin v. LaFleur*, 591 N.W.2d 711, 715 (Minn.1999).

In 1994 the Minnesota Motor Vehicle Retail Installment Act provided in relevant part:

> Every retail installment contract shall be in writing, *shall contain all the agreements of the parties*, shall be signed by the retail buyer and seller, and a copy thereof shall be furnished to such retail buyer at the time of the execution of the contract.

5. The dissent concluded that the trial court properly dismissed the MMVRISA claims as well as the other claims:

[MMVRISA] * * * merely prohibits dealers from relying on separate agreements that contain contradictory financing terms. * * * Because the conditional delivery agreement did not alter the credit terms that were disclosed in the installment sales contracts, * * * the trial court properly dismissed [Scott's] claims under MMVRISA. *Id.* at 721 (Short, J. concurring in part and dissenting in part).

6. A "condition precedent" is "any fact or event, subsequent to the making of a contract, which must exist or occur before a duty of immediate performance arises under the contract." *National City Bank v. St. Paul Fire &*

*Marine Ins. Co.*, 447 N.W.2d 171, 176 (Minn. 1989). In *451 Corp. v. Pension System for Policemen and Firemen*, we held that the requirement of loan approval is a condition precedent or subsequent to the formation of a contract and if the event required by the condition does not occur, there can be no breach. 310 N.W.2d 922, 924 (Minn.1981). We declined in *451 Corp.* to decide whether the requirement of loan approval was a condition precedent or condition subsequent, but explained that "whichever way the condition is characterized, if the event required by the condition does not occur, there can be no breach of contract." *Id.* Scott concedes that in this case it does not matter whether the financing contingency is labeled as a "condition precedent" or a "condition subsequent."

Minn.Stat. § 168.71(a)(1) (emphasis added). The statute also listed the items that a retail installment contract must contain:

(b) The retail installment contract shall contain the following items:

(1) The cash sale price of the motor vehicle which is the subject matter of the retail installment contract;

(2) The total amount of the retail buyer's down payment, * * *

(3) The difference between items one and two;

(4) The charge, if any, included in the transaction for any insurance and other benefits not included in clause 1, * * *

(5) Principal balance, * * *

(6) The amount of the finance charge;

(7) The total payments payable by the retail buyer to the retail seller and the number of installment payments required and the amount of each installment expressed in dollars or percentages, and date of each payment necessary finally to pay the total of payments which is the sum of item five and item six.

Minn.Stat. § 168.71(b)(1)-(7) (1994).

A year after the MMVRISA was enacted by the legislature in 1957 we held that the act "indicate[s] a legislative policy to bring both regulatory control and uniformity into the field of automobile financing" and an intent "to protect the purchasers of automobiles from the activities of a few individual[s] who had been guilty of inequitable practices in particular situations." *Van Asperen v. Darling Olds, Inc.,* 254 Minn. 62, 70–71, 93 N.W.2d 690, 696–97 (1958). In addition, we noted that the law was adopted to address "the fact that several states had enacted some form of regulation aimed particularly at automobile installment sales because the bona fide cost of installment credit had actually exceeded the rates generally allowed under usury statutes." *Id.* at 71, 93 N.W.2d at 697.

Several years later in *O'Brien v. Phillips Motors Excelsior, Inc.,* we again emphasized the legislative objective of informing the automobile buyer of the cost of the credit extended. 288 Minn. 183, 185, 179 N.W.2d 158, 160 (1970). Recently, in *Sharlow v. Wally McCarthy Pontiac–GMC Trucks–Hyundai, Inc.,* a U.S. District Court, under facts virtually identical to these, held that the MMVRISA was not violated and granted the defendant retailer summary judgment, stating:

Plaintiffs base their argument on statutory language prescribing that every retail installment contract "shall contain all the agreements of the parties." The plain purpose of the MMVRISA is to require disclosure to consumers of the cost of credit extended to them, including sale price, amount of down payment, insurance charges, and finance charges. The "agreement of the parties" clause serves to prohibit dealers from relying on separate agreements containing additional or contradictory financing terms. The Court does not read the clause as requiring that every agreement to a condition precedent be contained in the installment contract. Here all the credit terms were contained in the installment contract itself. Moreover, the addendum did not change any contract terms– it simply made the contract itself conditional.

No. 97–20 (D.Minn. Sept. 28, 1998) (citations omitted).

■ Our rulings in *Van Asperen* and *O'Brien* are entirely consistent with the statutory objective of section 168.71(a)(1) as evidenced by its statutory scheme. Section 168.71(a)(1) requires that "all the agreements of the parties" be included in the retail installment contract, and immediately following is section 168.71(b)(1)-(7) which provides that the retail installment contract "must contain the following items" all relating to the terms of credit: the cash sale price, the amount of the buyer's down payment, the principal balance and the amount of the finance charge,

and total payments, among others.[7] Similarly, the penalties set forth in Minn.Stat. § 168.75[8] for violations of Section 168.71(a)(1) are imposed in terms of enforcing the retail installment contract as modified by statutory penalties. Our conclusion in *Van Asperen* and *O'Brien* that section 168.71(a)(1) only requires that the buyer be informed of the *credit* terms is clearly supported by the statutory scheme.

The court of appeals agreed that section 168.71(a)(1) relates to credit terms but concluded that the failure of Scott to get approval triggered the higher financing charges in RIC II, thus the conditional delivery agreement relates to retail credit. The error in this conclusion is that it assumes that RIC I and II and the conditional delivery agreement were part of one contractual transaction, but they weren't, as the failure to obtain RIC I financing prevented it from becoming a contract at all. RIC II was binding however, as financing was in place when Scott signed it. As these were separate transactions, Forest Lake did not fail to inform Scott of the "cost of credit" because the terms of RIC II correctly and fully disclosed the credit terms, and there were no agreements relating to credit terms not contained in RIC II.

■ Finally, Scott's argument ignores the interrelationship of the three separate agreements relating to the financing transaction. The retail installment contract sets forth the details of how the financing is to work–the interest rate, the finance charge, amount financed, total payment and total sales price–and becomes effective only if financing is arranged. The conditional delivery agreement permits the buyer to take immediate possession of the vehicle, but the buyer is obligated to return it if financing is not approved, as happened here. The vehicle purchase contract sets forth the terms of the actual purchase, including trade-in allowances and identifies the amount to be financed, if any. Moreover, each agreement is dependent upon financing approval: the retail installment contract expressly states that it may not be binding, the conditional delivery agreement provides that the sale is null and void if financing is not approved, and the vehicle purchase contract provides that if the dealer is to arrange credit for respondent, the contract is not valid until the credit is accepted. We reject Scott's argument that all of these documents are subsumed into the retail installment contract as contrary to the clear objective of the MMVRISA, its statutory scheme and to our well-considered case precedent.

Reversed.

BLATZ, C.J., took no part in the consideration or decision of this case.

GILBERT, J., took no part in the consideration or decision of this case.

---

7. The retail installment contracts prepared by Forest Lake contained the information required in Section 168.71(b).

8. The statute provides in relevant part:
   > (b) In case of an intentional failure to comply with any provision of sections 168.66 to 168.77, the buyer shall have a right to recover from the person committing such violation * * * *the whole of the contract due and payable,* plus reasonable attorneys' fees.

   > (c) In case of a failure to comply with any provision of sections 168.66 to 168.77, other than an intentional failure, the buyer shall have a right to recover from the person committing such violation * * * *liquidated damages equal to three times the amount of any time price differential charged in excess of the amount authorized by sections 168.66 to 168.77* or $50, whichever is greater, plus reasonable attorneys' fees.

   Minn.Stat. § 168.75 (1998) (emphasis added).