Paulette B. LIABO, Appellant,

v.

WAYZATA NISSAN, LLC, Respondent.

No. A05–497.

Court of Appeals of Minnesota.

Jan. 17, 2006.

Allen H. Gibas, Allen H. Gibas P.A., and Richard J. Fuller, Mansfield, Tanick, & Cohen, P.A., Minneapolis, MN, for appellant.

Gregory J. Johnson and Klay C. Ahrens, Johnson, Provo–Peterson, L.L.P., St. Paul, MN, for respondent.

Considered and decided by RANDALL, Presiding Judge, PETERSON, Judge, and DIETZEN, Judge.

## OPINION

RANDALL, Judge.

This is an appeal from summary judgment on appellant's claims against a car dealership for violation of the Truth–in–Lending Act and the Minnesota Motor Vehicle Retail Installment Sales Act and for engaging in deceptive trade practices in violation of certain consumer fraud statutes. Appellant had signed certain documents regarding the purchase of a vehicle at a particular interest rate and then respondent refused to return her deposit when the sale was not completed because of appellant's withdrawal.

Appellant argues: (a) she did not sign a binding contract; (b) the seller was required to provide her with disclosures pursuant to the Truth–in–Lending Act and obtain her signature as required by Minn. Stat. § 168.71 (1998); (c) failure to provide such disclosures constitutes a deceptive trade practice within the meaning of Minn. Stat. §§ 325D.44 (1988) and 325F.69 (1986); (d) under the circumstances, it was a deceptive trade practice to retain the down payment where the buyer rescinded the contract prior to receiving such disclosures; and (e) other actions by the dealership constituted deceptive trade practices.

## FACTS

In response to an advertisement offering Nissan automobiles for sale and 2.9% annual percentage rate (APR) financing, Paulette B. Liabo, appellant, visited Wayzata Nissan, respondent. Upon arrival at respondent, appellant met with sales associate Jamie McGregor. After looking at and test driving various automobiles, McGregor and appellant discussed financ-

ing. As a result, appellant offered to purchase a 1998 Nissan Altima GXE for $19,158, contingent upon her being approved for the 2.9% APR financing. The 2.9% APR financing was available only to customers who were qualified under Nissan Motor Acceptance Corporation's (NMAC) Tier 1 or 2 guidelines.[1] Appellant agreed to purchase the 1998 Altima GXE for $19,158.

After appellant offered to purchase the GXE, a Delivery Sheet was prepared. A Delivery Sheet is prepared as part of every transaction where a customer purchases a motor vehicle, whether the customer arranges financing with respondent or finances the purchase through other means. The Delivery Sheet is a written record of the basic terms of the sale that are agreed upon during negotiations between the salesperson and the customer.

As part of the purchase, appellant was to trade in her 1987 Sentra for which she received $1,168 and make a down payment of $1,200. After adding sales tax of $1,169.35, administrative fees of $44.50, and license fees of $204, appellant was to finance approximately $18,208.[2] This information was recorded on the Delivery Sheet. Because appellant wanted to ensure her down payment of $1,200 would be refunded if she was denied financing at 2.9% APR, at her insistence, handwritten on the Delivery Sheet were the words "Special 2.9% O.A.C."

After all figures were recorded and the handwritten notation was inscribed, appellant signed the Delivery Sheet. Above her signature, in block lettering, was the statement:

I UNDERSTAND THAT THIS IS A BINDING CONTRACT AND I WILL LOSE ANY DEPOSIT IF I DO NOT PERFORM ACCORDING TO TERMS.

Both appellant and respondent understood that if appellant did not qualify for the 2.9% APR, her down payment would be refunded and she would not obligated to purchase the 1998 Altima GXE. Both understood that if she was approved for the 2.9% APR, she would be obligated to purchase the 1998 Altima GXE.

After completing the Delivery Sheet, appellant completed a credit application. Thereafter, Daniel Sinner, respondent's Sales Manager, ran a credit report. Based upon the results of the credit report, Sinner told appellant he doubted she would be approved for the special 2.9% APR financing. Her credit report indicated that appellant was delinquent and had a derogatory public record, a collection notice filed against her, and other accounts in delinquency. Sinner discussed with appellant alternative financing. One possible option was to submit her credit application to another bank, such as Chase Manhattan where appellant had an existing account. Although the APR was likely to be a bit higher, Sinner stated that she could receive a $500 rebate, which would help defray the higher APR. After discussing alternative financing with Sinner, appellant indicated she wanted to resolve the issues noted in her credit report. Appellant believed her credit problems were related to student loans. Sinner gave appellant the telephone number for Sallie Mae, a credit advisor company, and advised her as to what she needed to do to improve her credit.

In the meantime, at the request of appellant, respondent submitted her credit

---

1. Tier 1 and 2 qualified buyers are those who have preferred or standard credit ratings. Appellant qualified as a Tier 4 buyer which is generally reserved for those with a poor cred-

it history and often ends up with an interest rate/APR around 16%, or more.

2. This number represents the rounded up figure of the balance financed ($18,207.85).

application to NMAC, hoping to be approved for the 2.9% APR financing. Her credit application was also submitted to Chase Manhattan in case NMAC did not approve her for the special 2.9% APR. Subsequently, appellant was still not approved for the special 2.9% APR financing.

A finance associate with respondent recommended that appellant obtain documentation to show that her school loan problems had been resolved. Appellant did so and respondent's finance office sent a letter to NMAC's regional manager asking that NMAC reconsider its decision regarding the special 2.9% APR. Sinner made several calls to NMAC in an attempt to secure the special 2.9% APR financing. After some efforts on the part of respondent, appellant was notified that she had qualified for the special 2.9% APR financing which was approved for the purchase of the 1998 Altima GXE.

After respondent secured the 2.9% APR financing for appellant, she changed her mind and decided she wanted to purchase a different model, the Altima GLE, instead of the GXE. The GLE retailed for a higher price and Sinner informed appellant that the special financing would not be approved for the GLE. As a favor, Sinner contacted NMAC in an effort to allow the special 2.9% APR financing to be applied to the GLE but was told the 2.9% APR financing was approved only for the 1998 Altima GXE. Appellant decided not to purchase the 1998 Altima GXE. Respondent then refused to refund her $1,200 deposit under the terms of the Delivery Sheet.

Appellant argued that if the Delivery Sheet was a binding agreement, it was an agreement binding her to purchase a vehicle by credit. Therefore, she argues, respondent was obligated to make disclosures required of both the federal Truth in Lending Act (TILA) 15 U.S.C. § 1601, and the Minnesota Motor Vehicle Retail In-

stallment Sales Act (MVRISA) Minn.Stat. § 168.66 *et seq.* If the Delivery Sheet was not a binding contract, she argues respondent engaged in a deceptive trade practices within the meaning of Minn.Stat. §§ 325D.44 and 325F.69 because respondent represented the Delivery Sheet to be a binding contract and refused to refund her down payment. Respondent moved for summary judgment arguing that the Delivery Sheet was a binding contract, but that it was not solely a credit agreement requiring TILA and MVRISA disclosures. The district court granted summary judgment in favor of respondent, holding that the Delivery Sheet was a binding agreement but was not an agreement requiring appellant to purchase the vehicle solely on credit. The district court pointed out that appellant always had an option to change her mind about financing the vehicle and pay cash or borrow money from a source totally unrelated to respondent. The district court held the disclosure requirements of TILA and MVRISA were not required at this point. The district court determined that appellant was free to decline the 2.9% APR financing, but per the Delivery Sheet, she was obligated to purchase the 1998 Altima GXE, or lose her deposit.

This appeal followed. Appellant challenges the district court's finding that there were no genuine issues of material fact, that the Delivery Sheet was not a binding credit agreement requiring TILA and MVRISA disclosures, and that respondent did not engage in deceptive trade practices.

## ISSUES

I. Was the Delivery Sheet executed by appellant a binding contract requiring her to purchase a 1998 Altima GXE from respondent?

   a. If appellant was contractually obligated to purchase a 1998 Altima

CXE from respondent, was respondent required to make disclosures required by the Truth–in–Lending Act?

b. If appellant was contractually obligated to purchase a 1998 Altima GXE from respondent, was respondent required to make disclosures required by Minn.Stat. § 168.71?

II. Did respondent engage in deceptive trade practices within the meaning of Minn.Stat. §§ 325D.44 and 325F.69?

## ANALYSIS

Summary judgment may be granted if the pleadings, depositions, interrogatory answers, admissions, and affidavits reveal that there is no genuine issue of material fact and that a party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. In an appeal from a grant of summary judgment, appellate courts determine if there are any genuine issues of material fact and if the lower court erred in its application of the law. *N. States Power Co. v. Minn. Metro. Council,* 684 N.W.2d 485, 491 (Minn.2004). This court must "view the evidence in the light most favorable to the party against whom summary judgment was granted." *Westrom v. Minn. Dep't of Labor & Indus.,* 686 N.W.2d 27, 32 (Minn.2004). "The party opposing summary judgment may not establish genuine issues of material fact by relying upon unverified and conclusory allegations, or postulated evidence that might be developed at trial, or metaphysical doubt about the facts." *Dyrdal v. Golden Nuggets, Inc.,* 689 N.W.2d 779, 783 (Minn.2004).

## I. Contract

■ Appellant argues that if the Delivery Sheet was a binding contract obligating her to purchase the 1998 Altima GXE, she was only bound to purchase the vehicle on credit. If this is true, she argues, respondent was required to make specific disclosures under the Federal Truth–in–Lending Act (TILA) and the Minnesota Vehicle Retail Installment Sales Act (MVRISA). In the alternative, appellant argues that if the Delivery Sheet was not a binding contract, respondent engaged in deceptive trade practices violating Minn. Stat. §§ 325D.44 and 325F.69. To determine the issues, we must first determine whether the Delivery Sheet was a binding contract and, if so, was it a binding contract triggering the requirements of TILA and MVRISA.

Appellant argues the Delivery Sheet does not constitute a binding agreement because the price, a key term, was never approved. She argues the amount financed and listed on the credit application, $20,576, exceeds the price listed on the Delivery Sheet [3] and because the amount is not the same on the Delivery Sheet, there is no contract.

Although the listed price on the Delivery Sheet and the Credit Application were not the same, there was a binding agreement between the parties. As the district court observed, the amount to be financed is the same on both the Delivery Sheet and Credit Application.[4] The difference in the listed price is a result of adding all costs into the price on the Credit Application versus separating the costs on the Delivery Sheet. When adding to the price listed on the Delivery Sheet the tax ($1,169.35), license fees ($204), and docu-

---

3. The price listed on the Delivery Sheet is $19,158.

4. The Delivery Sheet amount listed to be financed is $18,207.85. This amount was rounded up to $18,208 on the Credit Application.

ment fees ($44.50), the amounts are identical. When appellant's down payment and trade-in are subtracted from the price, both the Delivery Sheet and the Credit Application show the same amount to be financed. The price may have been recorded differently on the Delivery Sheet and the Credit Application, but no one was misled as to the exact amount of the price or the amount to be financed.

Appellant also argues that the Delivery Sheet is not a binding contract because the 2.9% APR financing was initially denied and, therefore, not all conditions of the contract were met. She argues after she was initially denied financing, she demonstrated to respondent that she no longer wished to purchase the 1998 Altima GXE. She argues that respondent invited her to enter into negotiations to purchase other vehicles. We disagree. The facts show otherwise.

Appellant's actions after initially being denied the 2.9% APR show that she intended to do what she could in order to secure that special financing. After the 2.9% APR financing was initially denied, appellant attempted to clear her credit history in order to qualify for the financing. She contacted the United States Department of Education in an effort to address her student loan issues. Once she resolved her student loan issues, she hand delivered the appropriate documents to respondent's finance department. Appellant knew respondent was continuing its efforts to help her secure the special 2.9% financing. Even though respondent did assist appellant in looking at different cars, there was no indication from the appellant that she wanted to abandon the original agreement.

With respondent's urging and help, appellant eventually obtained the desired financing. After she was approved for the special financing, appellant wished to cancel her original purchase agreement for the GXE and now buy a more expensive model. She was then correctly told that the 2.9% financing was only good for the original desired automobile.

The district court held that the Delivery Sheet was a binding agreement, requiring appellant to purchase the specified automobile. The court held that the Delivery Sheet contained a condition precedent which required respondent to secure financing at 2.9% APR before the Delivery Sheet became binding. Because respondent secured the financing, the condition precedent was satisfied. The district court's finding is correct. Appellant was contractually obligated to purchase a 1998 Altima GXE from respondent, or forfeit her down payment.

a. If appellant was contractually obligated to purchase a 1998 Altima GXE from respondent, was respondent required to make disclosures required by the Truth–in–Lending Act?

■ Appellant argues that because the Delivery Sheet contains terms specifying that the balance of the cash price was to be financed at 2.9%, it could only have been effective, if at all, to create a credit obligation. She argues that because she was only obligated to purchase by credit, respondent was required to make TILA disclosures.

TILA requires that creditors make specific disclosures when entering into a credit agreement with a consumer. 15 U.S.C. § 1638(a). The disclosures are to be made before consummation of the credit agreement, which is defined as "the time that a consumer becomes contractually obligated on a *credit* transaction." 12 C.F.R. § 226.2(a)(13) (emphasis added).

Appellant argues TILA disclosures were required because she was extended credit when she signed the Delivery Sheet. She argues the Delivery Sheet extended credit to her because it states that respondent will sell an automobile to her for a stated price, her down payment, and it outlines the financing for the unpaid balance. She argues she consummated a credit agreement which requires specific disclosures under TILA.

Appellant cites two cases, *Terry v. Whitlock,* 102 F.Supp.2d 661 (W.D.Va.2000) and *Graves v. Tru–Link Fence Co.,* 905 F.Supp. 515 (N.D.Ill.1995), in support of her argument that the Delivery Sheet constituted a credit agreement requiring TILA disclosures.

In *Terry,* the court found a credit obligation where an automobile buyer entered into a Buyer's Order which stated that the order comprised the entire agreement affecting the purchase of the automobile. 102 F.Supp.2d at 664. Here, the Delivery Sheet did not comprise the whole agreement. It was understood that once appellant was approved for the 2.9% APR financing, she would then be required to fill out an installment contract which would list the total amount owed and monthly payments. Unlike the Buyer's Order in *Terry,* the Delivery Sheet did not compromise the complete agreement.

In *Graves,* the court found a credit obligation where a consumer and contractor entered into a fencing proposal which stated the total amount to be paid and amount to be paid each month. 905 F.Supp. at 518–19. *Graves* is not persuasive. Here, the Delivery Sheet did not list the total amount to be paid or the monthly payment amount. There was no credit agreement based upon the case law cited by appellant. In both *Terry* and *Graves,* there was more

to the initial contracts than the Delivery Sheet before this court. The Delivery Sheet listed the price, trade-in amount, down payment, and appropriate taxes and processing fees. There was no discussion regarding the total amount to be paid or monthly payments. Appellant's argument boils down to this: Respondent agreed to sell an automobile on credit to her; therefore, TILA disclosures were required.

The district court held that TILA disclosures were not required at this time because she was not obligated to accept the 2.9% APR financing. The district court reasoned that because a Delivery Sheet only serves to record the price, taxes, licensing fees, down payment, and trade-in value, it is not a retail installment contact which requires TILA disclosures. We find the record clear enough that the required disclosures would have been an obligation of respondent at a later time, but not at this point, and appellant was not misled. The Delivery Sheet was not a retail installment contract requiring TILA disclosures. All customers, whether they obtain financing through respondent or not, execute a Delivery Sheet. The terms recorded on the Delivery Sheet are then incorporated into a Purchase Agreement. If appellant had proceeded with the transaction, she would have next executed a Purchase Agreement and finally, a Retail Sales Installment Contract. The required TILA disclosures would be contained in the Retail Sales Installment Contract. The district court found that the Delivery Sheet was a binding contract, but it alone did not trigger the disclosure requirements of TILA or MVRISA. The district court's finding is correct.

Appellant argues she consummated a credit agreement. The Official Staff Commentary to Regulation Z[5] states that con-

---

**5.** Regulation Z is issued by the Board of Gov-    ernors of the Federal Reserve System to im-

summation "does not occur merely because the consumer has made some financial investment in the transaction (for example, by paying a nonrefundable fee) unless ... applicable law holds otherwise." 12 C.F.R. Pt. 226, Supp. I, § 2(a)(13). Additionally, the commentary explains that consummation "does not occur when a consumer becomes contractually committed to a sale transaction, unless the consumer also becomes legally obligated to accept a particular credit arrangement." *Id.* The commentary uses an example with facts similar to here to demonstrate its language. "When a consumer pays a nonrefundable deposit to purchase an automobile, a purchase contract may be created, but consummation for purposes of the regulation does not occur unless the consumer also contracts for financing at that time." *Id.* Here, appellant never became contractually obligated to accept a particular credit arrangement. The Delivery Sheet was not a contract setting out the particulars of a credit arrangement. It was solely a purchase contract stating the price of the automobile, the fees associated with the purchase, appellant's trade-in value and down payment, and the amount to be financed. Appellant knew additional documents were to be executed once she was approved for the financing. She testified that she expected to review and fill out loan papers after being approved for the financing. She testified that she expected the loan papers to include the "number of payments, how much the payments [were] going to be, [and] the interest charge."

TILA disclosures would only have been necessary if appellant had continued with the transaction and executed the Retail Installment Contract. She chose not to do so, therefore, the disclosures were not necessary.

b. If appellant was contractually obligated to purchase a 1998 Altima GXE from respondent, was respondent required to make disclosures required by Minn.Stat. § 168.71?

■  Appellant argues that respondent violated the Minnesota Motor Vehicle Retail Installment Sales Act (MVRISA) when it failed to make required disclosures under Minn.Stat. § 168.71(b). The district court held that the disclosures under MVRISA were not necessary because the Delivery Sheet was not a retail installment contract under Minn.Stat. § 168.71. The district court's finding is correct.

■  The Delivery Sheet executed by appellant was not a retail installment contract. Under Minn.Stat. § 168.66, subd. 4, a retail installment contract is defined as "any agreement ... evidencing a retail installment sale of a motor vehicle." A retail installment sale is defined as a "sale evidenced by a retail installment contract wherein [the] retail buyer agrees to buy and [the] retail seller agrees to sell a motor vehicle at a ... price payable in one or more installments." *Id.* at subd. 3. Although the Delivery Sheet does list the price, appellant's down payment, trade-in value, and various associated fees, it does not list any terms regarding installment payments and financing other than that the transaction was contingent on appellant being approved for the 2.9% APR financing. As stated by the district court, the next document executed, had appellant followed through with the purchase would have listed the exact terms of financing, including installment amounts and specifics. A retail installment contract typically sets forth details regarding financing such as the interest rate, finance charge, amount financed, and the total number of payments. Generally, a retail installment

plement the Federal Truth in Lending Act. 12 CFR 226.1.

contract comes into being only after financing is approved. *See Scott v. Forest Lake Chrysler–Plymouth–Dodge,* 611 N.W.2d 346, 351 (Minn.2000).

Here, the Delivery Sheet did not list any finance charges, nor the total amount of installment payments, the amount of each installment payment, or the date the payments were due. There was no "retail installment" contract at the point that appellant backed out of the transaction.

## II. Deceptive Trade Practices

■ Appellant argues that respondent engaged in deceptive trade practices. Specifically, she argues respondent violated Minn.Stat. §§ 325D.44 and 325F.69. She claims that respondent misrepresented the facts surrounding her potential purchase by engaging in conduct likely to confuse her about the balance to be financed, the status of the Delivery Sheet as a binding contract, and by failing to make the required disclosures required by MVRISA and TILA.

■ Minnesota's consumer-protection statutes are commonly read together so as to prohibit the use of deceptive and unlawful trade practices. Under Minn.Stat. § 325F.69, subd. 1, an unlawful practice is defined as

> [t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby. . . .

Consumer-protection statutes are remedial in nature and are liberally construed in favor of protecting consumers. *State by Humphrey v. Alpine Air Prods., Inc.,* 490 N.W.2d 888, 892 (Minn.App.1992), *aff'd,* 500 N.W.2d 788 (Minn.1993); *see also Wie-*

*gand v. Walser Auto. Groups, Inc.,* 683 N.W.2d 807, 812 (Minn.2004) (discussing policy and purpose underlying the MCFA); *State by Humphrey v. Phillip Morris, Inc.,* 551 N.W.2d 490, 496 (Minn.1996) (stating that the DTPA is broadly construed to enhance consumer protection).

■ For appellant to prevail on her argument, she must show that respondent *intentionally made a misrepresentation* in regards to the sale and that she suffered damages caused by the misrepresentation. *Group Health Plan, Inc. v. Philip Morris Inc.,* 621 N.W.2d 2, 12 (Minn.2001) (emphasis added). The district court found that respondent made no misrepresentations and appellant suffered no damages. The evidence supports the district court's findings.

Appellant argues that she was obligated to purchase the vehicle by credit only if she was approved for the 2.9% APR financing. She was approved for the 2.9% financing, allowing her to purchase the vehicle on credit through respondent, or pay cash, or find her financing elsewhere at a lender that did not involve respondent.

Appellant argues that respondent engaged in deceptive conduct by misrepresenting the transaction as one only involving credit. That is not the state of the record. Certainly, the facts look like appellant was not going to pay cash for the car, and wanted credit, but there is nothing to indicate that she was foreclosed from paying cash if she wanted to.

The Delivery Sheet states, above appellant's signature line, that the Delivery Sheet is a binding contract. Noted on the Delivery Sheet, at the insistence of appellant, are the words, "special 2.9% O.A.C." This notation was specifically recorded on the Delivery Sheet at the request of appellant to put on record that she was not obligated to purchase the vehicle if she was not approved for the 2.9% APR fi-

nancing. Respondent did not engage in deceptive trade practices or misrepresent the facts. Respondent took extra care to note on the Delivery Sheet that appellant was obligated to purchase the vehicle only if she was approved for the special financing. This is exactly what happened. Appellant was initially denied financing but through the efforts of respondent and her own, she was eventually approved for the financing. She understood exactly what she was getting into.

Appellant suffered no damages. She executed a contract that stated her $1,200.00 down payment would be refunded if she did not qualify for the special 2.9% APR financing. She was approved for that financing, but then rejected it for the car she had intended to buy, wanting to switch the preferential financing to a more expensive vehicle. When that request was denied, appellant tried to back out of the contract, not buy any car, and get back her down payment. We conclude respondent was entitled to appellant's down payment. That was a term of the agreement.

### DECISION

The Delivery Sheet and its terms formed a binding contract, requiring appellant to purchase a particular vehicle if she got approved for preferential financing. Appellant understood that after signing the Delivery sheet and being approved for financing, she would sign additional papers with the requisite disclosures being owed her in that time before her purchase was final. It was in these additional forms that the required disclosures needed in a retail installment contract would have been disclosed.

After being approved for the special financing, appellant defaulted on the purchase agreement and, thus, her down payment was forfeited.

Finally, respondent did not engage in any deceptive trade practices or misrepresentation.

**Affirmed.**